[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-11144
_____

D.C. Docket No. 2:10-cv-00428-CEH-DNF

JAMES R. PESCI,

Plaintiff - Appellant,

versus

TIM BUDZ,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 23, 2013)

Before BARKETT and MARCUS, Circuit Judges, and HUCK,[*] District Judge.

MARCUS, Circuit Judge:

---

[*] Honorable Paul C. Huck, United States District Judge for the Southern District of Florida, sitting by designation.

Appellant James Pesci, a civil detainee at the Florida Civil Commitment Center (FCCC), is involuntarily committed pursuant to Fla. Stat. § 394.910 et seq., the "Involuntary Civil Commitment of Sexually Violent Predators Act," commonly referred to as the "Jimmy Ryce Act."  The Act provides for involuntary civil commitment of a sex offender who is determined to be a sexually violent predator for the purposes of safeguarding the general public and rehabilitating the detainee. Pesci and some 600 other residents of the FCCC are not prisoners; rather they are civil detainees who have already served their terms of incarceration.

For some years, Pesci has published a newsletter called "Duck Soup" at the FCCC that is highly critical of the center, its policies, and its personnel.  In April 2009, Timothy Budz, the facility director at the center, promulgated a policy barring all residents from copying Duck Soup in order to limit its circulation, on the rationale that Duck Soup had disrupted order and discipline at the FCCC as well as had a powerful adverse effect on the facility's capacity to rehabilitate its civil detainees.  Pro se, Pesci filed a § 1983 civil rights action against Budz in the United States District Court for the Middle District of Florida.  He claimed the policy violated his expressive freedoms under the First and Fourteenth Amendments and therefore sought both monetary and injunctive relief.  In November 2010, after the litigation had begun but notably before the district court entered summary judgment for Budz, the facility director adopted a new, different,

2

and stricter policy treating the newsletter as "contraband" and banning outright its possession or distribution.  In February 2012, the district court granted final summary judgment in favor of the facility director, but only considered Pesci's First Amendment claim as to the April 2009 policy, offering no view about the replacement policy banning Duck Soup.  Pesci timely appealed, initially pro se, but now with the assistance of appointed counsel.

After thorough review, we vacate and remand for further proceedings consistent with this opinion.  In view of the peculiar posture of this case, we believe the wiser course would be for the district court to consider the constitutionality of the November 2010 policy banning Duck Soup along with the April 2009 policy.  The district court never had occasion to review the constitutionality of this more restrictive policy -- a policy that mooted out any possibility of injunctive relief based on the April 2009 policy.  Moreover, the record is limited and the plaintiff was uncounseled throughout the proceedings in the district court.  Accordingly, we remand the entire matter back to the district court to engage in the necessarily fact-intensive review of the facility director's policies in the first instance.  This course will avoid piecemeal adjudication of the constitutionality of the two policies.

I.

3

The complaint alleges that James Pesci has for "some years" published a newsletter called "Duck Soup" in both hard copy and online formats. The newsletter was available electronically for downloading and for printing and copying in the Florida Civil Commitment Center's computer lab. The record contains three issues of Duck Soup from July, August, and September of 2009. The newsletter primarily reported on FCCC matters and was often bitterly critical of the FCCC's staff, its management and the state contractor, GEO Group, Inc., that runs the facility. Thus, for example, in one issue Pesci described the Florida Department of Children and Families and its contractor GEO as a "white collared [sic], criminal enterprise" and encouraged FCCC staff to file lawsuits against GEO. Perhaps even more importantly, Pesci attacked the foundation and efficacy of the FCCC's treatment programs. He also said that FCCC residents should hold "collective protests" and "demonstrations" and that they were "coward[s]" for not doing so. In addition, he launched a series of personal attacks on several of FCCC's staff by name. He stated that a particular lieutenant liked watching residents shower; he accused the facility director Budz of using illegal drugs; and he claimed that the FCCC's medical staff caused a resident's death. Pesci was fully aware of the newsletter's inflammatory nature, writing in one month's newsletter that he had "every intention of hitting a lot of nerves in this month's edition." He also acknowledged the palpable tension that arose from some of the

4

content in Duck Soup, describing in one issue the hostility that he faced from some staff in the FCCC's medical department after publishing an earlier edition of the newsletter that "exposed" the department.

In April 2009, the facility director of the Florida Civil Commitment Center, Timothy Budz, promulgated a policy (the first policy) preventing residents from printing or copying Duck Soup in the FCCC's computer lab.[1]  According to Budz, the policy was designed to limit dissemination of the newsletter, which he claimed had generated substantial hostility between the detainees and the FCCC's staff, undermined staff authority, and disrupted detainee treatment.

In July 2010, Pesci, acting pro se, brought this civil rights action pursuant to 42 U.S.C. § 1983 against Budz, alleging that the first policy (the April 2009 policy) violated his First and Fourteenth Amendment rights.  He sought both monetary and injunctive relief  In November 2010, some months after the litigation had begun, Budz replaced the April 2009 policy with a second policy banning outright the possession or distribution of Duck Soup, citing the increasingly inflammatory nature of the newsletter and its continuing detrimental effect on order and treatment at the facility.  In April 2011, Budz moved for summary

---

[1] There is a factual dispute about the exact scope of the April 2009 policy.  Budz claims the April 2009 policy only prevented detainees from using FCCC paper, and that they could print or copy the newsletter with their own paper.  Pesci, on the other hand, filed affidavits from a few FCCC detainees saying they were forbidden from making any copies of Duck Soup in the computer lab, no matter whose paper they were using.  Because this factual dispute arises on summary judgment, it cannot be resolved by the court on summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252-55 (1986).

judgment.  Along with the motion, Budz filed his own affidavit and the affidavit of Dr. Robin Wilson, clinical director of the FCCC.  In his affidavit, Budz explained that staff members and residents named in Duck Soup had complained to him about the newsletter, offering that Duck Soup had caused real tension between the residents and the staff and among the facility's  employees as well.  According to Budz's version, the staff could still view Duck Soup online after the promulgation of the April 2009 policy and the residents could still make copies of the newsletter if they used their own paper instead of the institution's paper.  Budz averred that after promulgating the first policy in April 2009, Duck Soup became "increasingly inflammatory, degrading and demeaning toward FCCC staff and administration," and that it "continued to raise animosity, hostility, and anger among staff and residents by insulting certain staff and placing them in a false light amongst their peers and residents."  For these reasons, in November 2010, Budz adopted the second policy characterizing Duck Soup as "contraband" and forbidding its possession or distribution.

Dr. Wilson's affidavit, in turn, detailed the effects of Duck Soup on the treatment of the center's detainees.  He averred that Pesci used Duck Soup "to make reports on the GEO staff and other residents and would specifically name individuals."  Wilson observed that the newsletter created considerable tension between residents and the treatment staff during the period that Pesci was allowed

6

to publish the newsletter.  He offered that the newsletter caused the residents to lose confidence in the treatment staff and in the treatment itself, leading some residents to believe that the treatment staff were incompetent, the treatment program itself was a sham, and that they would never reach their ultimate goal of release.  Dr. Wilson also observed that the residents who pursued treatment were often unwilling to share their thoughts or information about themselves during group therapy sessions because they feared that what they said would wind up in Pesci's newsletter.  He opined that the April 2009 policy limiting circulation of Duck Soup did not improve the situation, but, notably, the effectiveness of the treatment program returned to normal after Budz banned the newsletter entirely on November 18, 2010.

Opposing the summary judgment motion pro se, Pesci offered two sets of largely identical affidavits from a total of eleven fellow detainees.  In the first set, eight detainees said the following:

- Duck Soup has not caused me to be hostile to any person, staff or resident.

- I have never been uncomfortable with the sharing of information with the Plaintiff James Pesci, and have been in group activity with Pesci.

- I have never known any other residents to fear their treatment issues being published in Duck Soup.

- The only parties I have ever heard complaint [sic] of Duck Soup were staff members employed at FCCC.

In the second set, three attested:

7

- While it may be true that the resident population is in a state of agitation it has nothing to do with Duck Soup, rather it is the prison like conditions of confinement that The Geo Group, Inc. is imposing on its mental health patients.

- I am in treatment and as such I have never witnessed any impairment of the treatment process at the Florida Civil Commitment Center as a result [of] the publication of Duck Soup.

- Per Tim Budz's order no resident is allowed to print or copy Duck Soup in the facility computer lab.  This standing order has never allowed such printing or copying to take place if a resident has his own paper.  This simply is not true.

In February 2012, sixteen months after the facility director adopted the second policy, the district court entered final summary judgment for Budz, concluding only that the first April 2009 policy was constitutional.  The court acknowledged the undisputed existence of the second November 2010 policy, which was in effect at the time it granted summary judgment, but declined to consider the second policy's lawfulness because Pesci had not formally amended his complaint.

## II.

We review a district court's order of summary judgment de novo, viewing all evidence and drawing all reasonable inferences in favor of the nonmoving party.  Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). Summary judgment is appropriate where the moving party demonstrates, through

8

materials in the record, that no genuine issue of material fact exists, and they are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c).

We begin with the question of whether the district court should have considered the lawfulness of the second November 2010 policy banning the newsletter outright at the same time it addressed the now-defunct first policy.  The district court declined to consider the second policy, offering only that Pesci's complaint had not been amended.

As we see it, it makes far more sense to consider the second policy along with the first.  The new policy replaced in toto the 2009 policy, rendering moot any discussion about whether injunctive relief could lie against the first policy.  Second, it banned outright all possession and distribution of the newsletter as opposed to simply limiting the means of its propagation.  Third, the record is largely undeveloped and Pesci, although now counseled, was proceeding pro se throughout the summary judgment proceedings.  We add that the November 2010 policy, as a factual matter, was clearly placed before the district court.  Indeed, in a "Pretrial Narrative Statement" Pesci filed in June 2011, Pesci complained broadly that Budz "unconstitutionally shut down the newsletter Duck Soup."  Pesci also put the November 2010 policy before the court in the form of a motion for a preliminary injunction.  Moreover, there has been no factual dispute at any time about the existence of the November 2010 policy which banned outright the

newsletter, deeming it to be contraband.  Indeed, Budz issued a memorandum to that effect to all FCCC residents and staff on November 18, 2010.  Accordingly, we can see precious little reason for addressing and adjudicating piecemeal first the April 2009 policy and then only later the 2010 policy, which swallowed up the first one.

Indeed, by the time summary judgment was entered by the district court, consideration of the November 2010 policy's constitutionality was the only way the district court could meaningfully address Pesci's request for injunctive relief.  The November 2010 ban supplanted in every respect the April 2009 policy.  By limiting its inquiry, however, only to the April 2009 policy, the district court effectively mooted Pesci's application for an injunction.  Even if the district court had been disposed to enter an injunction concerning the April 2009 policy, any such order would have been wholly academic and advisory.  While Pesci's application for monetary damages arising from the April 2009 policy was not mooted by the adoption of the 2010 policy, Pesci specifically sought injunctive relief as well.  Thus, in the face of the procedural posture of the case, including the unitary nature of the claims, the initial pro se status of the plaintiff, the limited record, and the powerful prudential need to avoid piecemeal adjudication, we conclude that the November 2010 policy should be considered along with the April 2009 policy in the first instance by the district court.  While we offer no view about

the merits, we believe the wiser course is to vacate the final order of summary judgment and remand for proceedings consistent with this opinion.

III.

The central legal issue raised in this case concerns the appropriate legal standard against which to measure Pesci's First Amendment claim. The district court applied the standard drawn from the Supreme Court's landmark opinion in Turner v. Safley, 482 U.S. 78 (1987), where the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests," id. at 89.  Pesci, however, argues that since he is not a prison inmate -- rather only a civil detainee -- Turner does not provide sufficient protection of his First Amendment rights, offering instead a standard of intermediate scrutiny which he has drawn from United States v. O'Brien, 391 U.S. 367 (1968).  In light of the limited case precedent available, and in order to provide further guidance to the district court, we address the appropriate legal standard.

In Turner, the Supreme Court recognized that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," and that federal courts must "discharge their duty to protect constitutional rights."  Id. at 84. But the Court also recognized that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform."  Id. (quoting

Procunier v. Martinez, 416 U.S. 396, 405 (1974), overruled on other grounds by

Thornburgh v. Abbott, 490 U.S. 401 (1989)).  Prison administration "is an

inordinately difficult undertaking that requires expertise, planning, and the

commitment of resources, all of which are peculiarly within the province of the

legislative and executive branches of government."  Id. at 84-85.  Because the task

of prison administration is committed to those branches, "separation of powers

concerns counsel a policy of judicial restraint."  Id. at 85.  Recognizing these

competing concerns, the Court concluded that its task was "to formulate a standard

of review for prisoners' constitutional claims that is responsive both to the policy

of judicial restraint regarding prisoner complaints and to the need to protect

constitutional rights."  Id. (internal quotation marks omitted); see also Bell v.

Wolfish, 441 U.S. 520, 546 (1979) ("The fact of confinement as well as the

legitimate goals and policies of the penal institution limits [inmates'] retained

constitutional rights.  There must be a mutual accommodation between institutional

needs and objectives and the provisions of the Constitution that are of general

application." (citations and internal quotation marks omitted)).

The balance the Court struck was embodied in a four part inquiry:

(1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of

12

prison resources generally; and (4) whether the regulation represents an "exaggerated response" to prison concerns.

Pope v. Hightower, 101 F.3d 1382, 1384 (11th Cir. 1996) (quoting Turner, 482 U.S. at 89-91).  This standard was necessary if "'prison administrators . . ., and not the courts, [are] to make the difficult judgments concerning institutional operations.'"  Turner, 482 U.S. at 89 (alterations in original) (quoting Jones v. N. Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 128 (1977)).  A more heightened standard of review would inevitably make the courts "the primary arbiters of what constitutes the best solution to every administrative problem, thereby unnecessarily perpetuating the involvement of the federal courts in affairs of prison administration."  Id. (alterations and internal quotation marks omitted).

We determine that a similar balance should be struck in scrutinizing the constitutional claims of civil detainees, but the standard must be modified to reflect the salient differences between civil detention and criminal incarceration.  As the district court rightly noted, Pesci is not a prisoner and the Florida Civil Commitment Center is not a prison.  Application of the Turner standard in the civil detention context must be tailored to reflect that the range of legitimate governmental interests is narrower here than it is in a prison context.  More precisely, the "legitimate penological interests" highlighted by the Supreme Court in Turner are not coextensive with the legitimate interests found in the civil detention context.  Thus, the government's interests in retribution and general

13

deterrence -- plainly legitimate justifications for prison regulations -- decidedly are not a proper foundation for the restriction of civil detainees' constitutional rights.

The Supreme Court drew this distinction with clarity when it upheld a Kansas statute similar to the Florida statute providing for civil commitment of sexually violent predators. See Kansas v. Hendricks, 521 U.S. 346 (1997). In Hendricks, the cross-petitioner challenged the constitutionality of the statute on double jeopardy and ex post facto grounds. In rejecting these challenges, the Court was "unpersuaded by Hendricks' argument that Kansas has established criminal proceedings." Id. at 361. The Court noted that "commitment under the Act does not implicate either of the two primary objectives of criminal punishment: retribution or deterrence." Id. at 361-62. The Court further emphasized that "involuntary confinement pursuant to the Act is not punitive" and that "commitment under the Act is not tantamount to 'punishment.'" Id. at 369. These were not mere asides; rather, the Court's "conclusion that the Act is nonpunitive thus remove[d] an essential prerequisite for both Hendricks' double jeopardy and ex post facto claims." Id.; see also id. at 373 (Kennedy, J., concurring) ("On the record before us, the Kansas civil statute conforms to our precedents. If, however, civil confinement were to become a mechanism for retribution or general

14

deterrence . . . our precedents would not suffice to validate it.").[2]  Thus, the government undoubtedly may justify a civil detention regulation based on its valid, rational connection to legitimate interests in institutional order, safety, and security and in the rehabilitation and treatment of civil detainees, but it may not justify a restraint on detainees' constitutional rights for reasons related to punitive conditions of confinement.  See id. (Kennedy, J., concurring) ("[W]hile incapacitation is a goal common to both the criminal and civil systems of confinement, retribution and general deterrence are reserved for the criminal system alone.").  In short, while there may be shared governmental interests surrounding civil and criminal detention, they are not coextensive.  Thus, in the context of this case, the government may not justify a limitation on expressive freedoms based on retribution or general deterrence.

Pesci, however, asks this Court to go further than this modification to the first Turner factor.  He relies on Youngberg v. Romeo, 457 U.S. 307 (1982), arguing that a more searching standard of review should apply.  In Youngberg, the Supreme Court observed that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."  Id. at 321-22.  But this observation does not warrant the wholesale departure from the Turner

---

[2] Justice Kennedy's concurrence is especially relevant because Justice Kennedy also provided the fifth vote for the Court's opinion.

standard that Pesci now urges on us.  Indeed, <u>Youngberg</u> establishes that many of

the considerations upon which the <u>Turner</u> standard is grounded, including, notably,

judicial restraint and deference to the professional judgment of institutional

officials, remain relevant in a civil detention context as well.

In <u>Youngberg</u>, the mother of an involuntarily committed civil detainee

brought a next friend § 1983 claim challenging her son's conditions of

confinement.  The Court held that civil detainees have a constitutionally protected

liberty interest under the Due Process Clause of the Fourteenth Amendment to

reasonably safe conditions of confinement, freedom from unreasonable bodily

restraints, and such minimally adequate training or "habilitation" as reasonably

may be required by these interests.  <u>Id.</u> at 314-19.  The Court noted that these rights

are not absolute, however, and may sometimes be drawn into conflict.  Thus, the

Court recognized the need to articulate a standard of review that balanced the

detainee's liberty interests against the relevant state interests.  <u>Id.</u> at 321.  The

standard the Supreme Court adopted requires only "that the courts make certain

that professional judgment in fact was exercised," and that in determining what

minimally adequate habilitation may be reasonable, "courts must show deference

to the judgment exercised by a qualified professional."  <u>Id.</u> at 321-22.  Plainly, as

the Supreme Court expressly recognized, this standard is lower than a

"compelling" or "substantial" governmental interests test, and such a heightened

16

standard "would place an undue burden on the administration of institutions." Id.
at 322; accord id. ("By so limiting judicial review of challenges to conditions in
state institutions, interference by the federal judiciary with the internal operations
of these institutions should be minimized."). Just as it would do in Turner five
years later, the Court emphasized a principle of judicial deference to the
professional judgment of institutional officials. See id. at 322-23.

There are parallels that may be drawn between the administration of an
institution like the FCCC and a prison that support the application of a modified
Turner standard we describe herein. Florida enacted a law providing that a person
determined by a court or jury to be a "sexually violent predator" is required,
following his term of incarceration, to be housed in a "secure facility" and
segregated from other detainees not committed under the law in order to receive
"control, care, and treatment until such time as the person's mental abnormality or
personality disorder has so changed that it is safe for the person to be at large."
Fla. Stat. § 394.917(2) (emphasis added). A "sexually violent predator," in turn, is
defined as a person who "[h]as been convicted of a sexually violent offense" and
who "[s]uffers from a mental abnormality or personality disorder that makes the
person more likely to engage in acts of sexual violence if not confined in a secure
facility for long-term control, care, and treatment." Id. § 394.912(10). As the
Florida Supreme Court has observed, the law was enacted for the "dual state

17

interests of providing mental health treatment to sexually violent predators and protecting the public from these individuals." Westerheide v. State, 831 So. 2d 93, 112 (Fla. 2002).

Although not a prison, the FCCC is a facility that houses approximately 600 persons involuntarily committed as sexually violent predators after their terms of incarceration. Florida law commands both that the facility be secure and that it serve a rehabilitative purpose, thus making those twin aims every bit as relevant and legitimate here as in the prison context. Moreover, FCCC staff and the state contractor GEO that manages the facility are the ones that "are best equipped to make difficult decisions" regarding the administration of the facility in keeping with these obligations. Washington v. Harper, 494 U.S. 210, 223-24 (1990) (citing Turner, 482 U.S. at 84-85; Jones, 433 U.S. at 128). We can discern no salient difference between a civil detention center like the FCCC and a prison on this point, making the balance the Supreme Court struck in Turner equally applicable here. At the same time, deference to the professional judgment of the facility administration is not tantamount to carte blanche permission to deny the fundamental rights of free speech and free expression. Care must be exercised to examine each claim individually and particularly.

Moreover, we again observe that the Turner standard is a deferential one, but it is not toothless. See Thornburgh, 490 U.S. at 414 ("We adopt the Turner

18

standard in this case with confidence that, as petitioners here have asserted, 'a reasonableness standard is not toothless.'"). Turner itself illustrates the point. At issue in Turner were two regulations: a restriction on inmate-to-inmate correspondence between different institutions and a marriage regulation that permitted inmates to marry only with the permission of the superintendent of the prison, who, in turn, could only give approval when there were "compelling reasons to do so." Turner, 482 U.S. at 81-82. The inmate-to-inmate restriction passed muster because of legitimate security concerns about the coordination of escape plans and assaults and the need to curb gang communications and the absence of any obvious alternatives. Id. at 91-93. But the marriage regulation -- which amounted to an "almost complete ban on the decision to marry" -- was not reasonably related to the legitimate penological interests of either security or rehabilitation, because there were obvious, easy alternatives that would accommodate inmates' right to marry with only a de minimis burden on security objectives. Id. at 97-99. As an example, the Court cited the federal regulation generally permitting federal prisoners to marry unless the warden finds that the marriage presents a threat to the security or order of the institution or to public safety. Id. at 98 (citing 28 C.F.R. § 551.10). Deference to facility administrators and concerns relating to safety and security cannot be used as a pretext to silence undesirable speech.

19

Finally, Pesci has not provided us with a satisfactory alternative standard. He concedes that the governing standard must be less than strict scrutiny, because civil detainees do not have all of the liberties afforded non-confined persons, but urges that the standard be more restrictive than is found in Turner's reasonableness review.  Thus, he recommends some form of intermediate scrutiny drawn from United States v. O'Brien, 391 U.S. 367 (1968).  In O'Brien, the Supreme Court upheld a 1965 law criminalizing the destruction of Selective Service certificates. The Court subjected the law to the following standard:

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

Id. at 377.

The problem with adopting this standard is that O'Brien had nothing to do with detention centers -- whether penal or civil in nature -- and said nothing about the balance of interests that must be weighed in those contexts.  Indeed, adoption of the O'Brien standard would mark a departure from the balance struck by the Supreme Court in Turner and Youngberg.  It would change the governmental interest from "legitimate," Turner, 482 U.S. at 89, to "important or substantial," O'Brien, 391 U.S. at 377, and it would require the restriction of First Amendment rights to be "incidental" and "no greater than is essential to the furtherance" of the

20

governmental interest, id., rather than being "reasonably related" to governmental interests. The far more probing standard found in O'Brien would leave little room for judicial restraint and the deference to institutional officials' professional judgment required in both the civil detention and prison contexts. Indeed, the adoption of an "important or substantial" interests test would find itself in considerable tension with the Supreme Court's observation, in the civil detention context, that a heightened standard would place an "undue burden" on institutional officials and the administration of civil detention facilities. Youngberg, 457 U.S. at 322.

In short, we hold that a rational relation standard as described herein is the appropriate standard against which to measure Pesci's First Amendment claims. The district court's order of final summary judgment in favor of Budz is vacated, and the case is remanded for further proceedings.[3]

**VACATED AND REMANDED.**

---

[3] In light of our disposition of this case, Pesci's pending motion for this Court to take judicial notice of various media reports is DENIED as moot.

We add that in our view counsel should be appointed at the trial level to represent Pesci on remand, and observe that appointed appellate counsel has well and vigorously represented Pesci on appeal.