[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-11218

_____

HJALMAR RODRIGUEZ, JR.,

Plaintiff-Appellant,

*versus*

EDWARD H. BURNSIDE, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 5:17-cv-00010-MTT-CHW

_____

Before JILL PRYOR, GRANT, and MARCUS, Circuit Judges.

GRANT, Circuit Judge:

To test whether a state prison regulation violates an inmate's constitutional rights, courts ask whether the regulation is reasonably related to a legitimate penological interest. That inquiry is intended to ensure that prison officials respect constitutional boundaries without frustrating their efforts to fulfill the difficult responsibility of prison administration.

Here we consider two Georgia prison policies that control how officers transport inmates to showers, and we ask whether those policies interfere with an inmate's First Amendment right to free exercise of religion. Although the inmate suggests ways the prison could make an exception to accommodate his religious requests, he does not show that the policies were unconstitutional in the first place. And even if they were, qualified immunity would protect the officials because the types of shower rights the inmate seeks are not clearly established. We affirm the district court.

## I.

Hjalmar Rodriguez was imprisoned at Hays State Prison after he was convicted of voluntary manslaughter. While he lived there, Rodriguez killed another inmate by stabbing him with a knife during a fight. Understandably concerned that he was a safety risk, prison officials moved him into the Special Management Unit at the Georgia Diagnostic and Classification Prison. That unit handles "offenders who commit or lead others to commit violent,

disruptive, predatory, or riotous actions, or who otherwise pose a serious threat to the security of the institution."   The unit's rigorous policies reflect the greater risk those inmates pose to prison safety and security.

For most of his time in that unit, Rodriguez was housed in wings with single-occupancy cells.  These cells were not equipped with showers, but prison policy was to escort each inmate to a separate shower three times per week.  To ensure safety and security during the shower transports, prison officers in the unit followed a set of strict procedures.  To start, each transport required the dedicated attention of between two and five officers. Clothing was also kept to a minimum—inmates could wear only boxers and shower shoes when walking to the shower, and could not bring along any other clothes.  Before leaving their cells, inmates handed any necessary items through a cell-door port so that an officer could "thoroughly check" for contraband.  Only the bare necessities were allowed—soap and a towel.  Once the items were searched, the officers handcuffed the inmate through the door port, opened the door, and finally secured the inmate in leg shackles.

Only then could an inmate be taken to the shower.  With yet another step-by-step process, the inmate was unshackled, locked in the shower, and unhandcuffed.  After the shower, the process then went in reverse—the inmate was again searched and secured before being taken back to his cell by a group of officers.

Though tedious, these steps were meant to ensure "that the escorting officers were safe and that the prison remained secure." As the deputy warden explained, the "shower security protocol" helped stop the flow of contraband and weapons that could be hidden in clothing and taken to the shower.

Rodriguez, however, disagreed with those policies and believed that the restrictions infringed his constitutional rights. As a Muslim, Rodriguez practiced *ghusl*, a ritual bathing that involves washing the whole body multiple times and that must be completed every 24 hours. He complained that *ghusl* was impossible to perform using the sink and towel in his cell because it "requires a large amount of water" and would have produced a slipping hazard. Rodriguez conceded that the sink and towel were helpful, enabling him to perform a simpler and more frequent religious washing called *wudu*. But because prison officials were not providing him with daily showers, they were—at least as he saw it—violating his First Amendment right to freely exercise his religion.

Rodriguez's religious beliefs also dictated that he dress modestly "by wearing garments that cover from mid-stomach or the naval to the bottom of the knees" around anyone but immediate family. Of course, the shower transport policy did not allow for that much clothing—he could wear only boxers and shower shoes. The policy thus contravened his religious modesty obligations by requiring him to expose both his lower stomach and a portion of his leg above his knee.

To challenge these policies and raise a host of other complaints, Rodriguez sued several prison officials under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc–1, and 42 U.S.C. § 1983, seeking declaratory, injunctive, and monetary relief.  In his complaint, Rodriguez claimed that the shower policies intruded on his First and Fourteenth Amendment rights.

The district court granted summary judgment to the prison officials on his shower policy claims.  Adopting the magistrate judge's report, the court held that prison officials had not violated Rodriguez's First and Fourteenth Amendment rights when they enforced the prison's shower policies.  The policies were "reasonably related to the legitimate penological interests in securing the prison."  It also held that he was not entitled to relief under RLUIPA because his injunctive claims were mooted when he was transferred out of the Special Management Unit.

Rodriguez appeals, contending that the shower policies fail First Amendment scrutiny.  The prison officials disagree, and argue that they are entitled to qualified immunity in any event. Rodriguez also argues that the magistrate judge was incorrect to reject motions related to discovery requests and appointment of counsel.

## II.

We review de novo the district court's grant of summary judgment to the prison officials on Rodriguez's free exercise claim.

6                        Opinion of the Court                    20-11218

*See Jurich v. Compass Marine, Inc.*, 764 F.3d 1302, 1304 (11th Cir. 2014). We view all facts and reasonable inferences in the light most favorable to the nonmoving party, and summary judgment is proper when the moving party is entitled to judgment as a matter of law. *Id.*

### A.

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). But those protections can be limited, because they sometimes conflict with an inmate's "status as a prisoner or with the legitimate penological objectives of the corrections system." *Pesci v. Budz*, 935 F.3d 1159, 1165 (11th Cir. 2019) (quotation omitted); *see also Pell v. Procunier*, 417 U.S. 817, 822 (1974).

Deciding what limits are permissible is tricky—running a prison "is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 84–85. Respect for the separation of powers thus requires us to exercise "judicial restraint regarding prisoner complaints." *Id.* at 85 (quotation omitted). And when critiquing a state penal system, principles of federalism "bolster that deference." *Pesci*, 935 F.3d at 1165.

To allow prison officials "to remain the primary arbiters of the problems that arise in prison management," we evaluate a

prisoner's constitutional claim under a "unitary, deferential standard." *Shaw v. Murphy*, 532 U.S. 223, 229–30 (2001). Under that standard, a prison regulation burdening an inmate's exercise of constitutional rights must be "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

To succeed on a constitutional claim, an inmate must show that "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* at 89–90. We do not inquire whether the prison could make an individualized exception for the complaining inmate—we assess "only the relationship between the asserted penological interests and the prison regulation." *Shaw*, 532 U.S. at 230.

The Supreme Court in *Turner* outlined four factors that frame our analysis. To decide whether the prison's policies impermissibly burden Rodriguez's First Amendment right to free exercise, we ask

> (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it";
>
> (2) whether "alternative means" of exercising the right "remain open to prison inmates," such that they may "freely observe a number of their religious obligations";

(3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and

(4) whether any "obvious, easy alternatives" to the current regulation exist, which would suggest that the policy is an "exaggerated response to prison concerns."

See *Turner*, 482 U.S. at 89–91 (quotations omitted); *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 352 (1987).

To be quite clear, we do not balance these factors to see if some outweigh the others. *Beard v. Banks*, 548 U.S. 521, 532–33 (2006) (plurality opinion). The last three factors are valuable because they provide more angles from which to view the fundamental inquiry: whether the prison regulation is reasonably related to legitimate penological interests. *Turner*, 482 U.S. at 89. If that rational connection is missing, "the regulation fails, irrespective of whether the other factors tilt in its favor." *Shaw*, 532 U.S. at 229–30; *Pesci*, 935 F.3d at 1167. And if the connection exists, the policy will stand. See *Beard*, 548 U.S. at 533.

## B.

We start with the three-showers-per-week limitation. Rodriguez does not dispute that the prison officials' asserted interests in this rule are legitimate. He accepts that transporting an inmate to the shower "involved 'safety and security risks' and was

'time- and labor- intensive' for correctional officers." No doubt that is true—promoting prison security is "perhaps the most legitimate of penological goals." *Overton v. Bazzetta*, 539 U.S. 126, 133 (2003); *Prison Legal News v. Sec'y, Florida Dep't of Corr.*, 890 F.3d 954, 967 (11th Cir. 2018). The Supreme Court has long recognized that prisons make do with "limited resources for preserving institutional order" and thus deserve deference in how they allocate those resources. *Turner*, 482 U.S. at 90.

Turning to the first *Turner* factor, a rational connection exists between limiting the frequency of showers and furthering safety and security. The policy requires multiple officers during the shower transport to help if an inmate resists returning to his cell, refuses to be handcuffed, or threatens the transporting officers. And the safety risk to officers is real—the unit houses the most "violent, disruptive, predatory" inmates in the Georgia prison system. In fact, some inmates are classified as so dangerous that they may be transported only if three officers are present and two of them are armed. Rodriguez himself demonstrates why such extreme care is called for—he was moved to the Special Management Unit after killing another inmate. The prison's precautions are reasonably calculated responses to the risks involved in transporting this category of inmates.

Nor does it matter that the prison officials have not presented "evidence of an actual security breach." *Prison Legal News*, 890 F.3d at 968. To justify a security policy, prison officials need not establish a causal link between the practice and a

reduction in violent incidents. *Id.* Instead, prison officials may "*anticipate* security problems" and "adopt innovative solutions." *Id.* (quotation omitted). A policy like this one—directly mitigating risk to prison safety and security—is reasonable.

The remaining three factors confirm this connection. *O'Lone* guides how we review the second factor. There, the prison's work policy prevented Muslim inmates from attending their Friday prayer service. *O'Lone,* 482 U.S. at 345–47. Even so, the Supreme Court held that the prisoners retained alternative means of religious exercise because the prison allowed them "to participate in other religious observances of their faith"—other prayer meetings, access to a state-provided imam, special meals, and modified mealtimes during the month of Ramadan. *Id.* at 352.

Rodriguez argues that refusing to provide him a daily shower left him with no alternative means of exercising his religion. But he misconstrues our inquiry. The question is not whether the prison accommodated every aspect of his religious practice, but whether he was allowed other means of practicing his religious beliefs. *See id.*, 482 U.S. at 352. And when we consider the prisoner's free exercise of religion, the right "must be viewed sensibly and expansively." *See Thornburgh v. Abbott*, 490 U.S. 401, 417 (1989). As long as a prisoner like Rodriguez retains "the ability to participate in other Muslim religious ceremonies," the second factor tips against him. *See O'Lone*, 482 U.S. at 352.

Rodriguez could exercise his religion in many other ways. He could perform *wudu*, the other religious washing ritual, using

the sink in his cell. And the prison allowed Muslim inmates to participate in "Friday Jumah service" by having the Muslim chaplain "go cell by cell to individual inmates for their Friday prayer." The prison also adjusted the meal schedule during Ramadan for those who wanted to observe the religious fast; they were "provided a morning meal around dawn (before sunrise) and an evening meal after sunset." These steps show that Rodriguez had many alternative means of practicing his religious faith despite the shower policy.

The third factor, resource allocation, also suggests that the prison's policy was reasonable. Providing daily showers would have been a severe drain on the prison's limited resources, forcing prison officers to more than double the time they spent making shower transports. Requesting such a "significant reallocation" of resources, the Supreme Court has explained, interferes with the smooth functioning of a prison. *Overton*, 539 U.S. at 135. These consequences confirm that the three-showers-per-week policy rationally advances the prison's security interests.

Our last consideration when deciding whether a prison rule is reasonably related to a legitimate interest is whether any "obvious, easy alternatives" to that regulation exist. *Turner*, 482 U.S. at 90. This is a "high standard," designed to flush out whether the current policy is an "exaggerated response" to the prison's concerns. *Overton*, 539 U.S. at 136; *Turner*, 482 U.S. at 90 (quotation omitted). To meet it, a proposed alternative must be a simple and unmistakably effective choice.

Rodriguez argues that an alternative to the three-showers-per-week policy would have been to move him to another cell block where the cells contained personal showers.[1]  But the fact that the prison could have moved him to a cell where he would not need shower transports does not suggest that the shower policy itself was irrational.  In fact, Rodriguez is not proposing an alternative policy at all—he is asking for an individual exemption.  We commonly confront such requests when reviewing RLUIPA claims.  Under that standard (which is stricter on prisons than *Turner*), we assess whether a prison policy *as applied to an individual prisoner* is the "least restrictive means" of furthering a "compelling governmental interest."  *Holt v. Hobbs*, 574 U.S. 352, 362–63 (2015) (quoting 42 U.S.C. § 2000cc–1(a)); *Dorman v. Aronofsky*, —F.4th—, No. 20-10770, 2022 WL 2092855, at *3–4 (11th Cir. June 10, 2022).  The prison may also need to justify its denial of "specific exemptions to particular religious claimants" under RLUIPA's "focused" inquiry.  *Id.* (quotation omitted).  That framework is not relevant here, however, because Rodriguez appealed the dismissal of his § 1983 claims, not his RLUIPA claims.

---

[1] The prison officials argue that Rodriguez waived this issue by not properly objecting to the magistrate judge's recommendation.  But in doing so, they fail to construe Rodriguez's pro se district court filings liberally.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Rodriguez sufficiently proposed the daily-shower alternative below, so the officials should have addressed the merits of his argument.

And *Turner* makes no comparable, individualized demands. It only requires a prison's policy to be rationally related to a legitimate government interest. To bring his First Amendment challenge to the policies under *Turner*, Rodriguez must do more than propose a personal accommodation. He must present an obvious alternative policy that could replace the current one on a prison-wide scale. *See Turner*, 482 U.S. at 93. For example, in *Prison Legal News* a publisher challenging a prison's magazine ban suggested that the prison could restrict inmates' access to prohibited services rather than banning its magazine for advertising those services. 890 F.3d at 974. And in *Overton v. Bazzetta*, a prison policy excluded most minor visitors other than immediate family; the suggested alternative was to allow "nieces and nephews or children for whom parental rights have been terminated" to visit. 539 U.S. at 129–30, 136. Rodriguez, on the other hand, falls short of proposing any alternative policy.

Instead, he insists that the prison officials had to "explain their refusal" to move him. But the Supreme Court has held otherwise: a prison need not "shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 90–91. The prison regulation need only be reasonable. The three-showers-per-week policy thus survives scrutiny.

## C.

We apply the same *Turner* factors to consider whether it was reasonable to limit prisoners to wearing only boxers and shoes

to the shower. The prison limited what prisoners wore to the shower because "contraband could be hidden in clothing and weapons could be taken to the shower." The same interests—safety and security—also justify this shower policy. And the validity of these interests, as we said earlier, is "beyond question." *Thornburgh*, 490 U.S. at 415.

Turning to the first factor, the policy rationally advances safety and security. Limiting the places where a prisoner could hide a weapon reduces the risk that an officer will be harmed, as well as the risk that the weapon will be conveyed to other prisoners. Rodriguez argues that the officials said that transporting prisoners in "full dress" rather than in boxers and shower shoes would threaten prison safety; allowing him to add a t-shirt to his shower garb would make no difference in his view given their justification. But we do not nitpick whether a policy could be adjusted to accommodate a prisoner's interest—this is not a "least restrictive alternative" test. *Turner*, 482 U.S. at 90 (quotation omitted). Quite simply, more clothing presents a greater safety threat. Because limiting what prisoners wear and carry to the shower makes it harder to move weapons or contraband, the policy is rationally related to advancing prison safety.

The remaining three factors implicate much of the same reasoning behind the other policy, so we do not rehash every detail. The second factor translates unchanged: Rodriguez was allowed alternative means of exercising his religious beliefs. As for the third factor, requiring the prison to allow prisoners to wear

t-shirts during shower transports would introduce the specific risk to prison safety and security that the policy sought to prevent. Other methods of mitigating the risk would require officers to dedicate more time and energy to carefully searching the extra clothing. Those added burdens confirm that the security policy rationally advances the prison's interest in safety. *See Beard*, 548 U.S. at 532–33.

Under the fourth factor, Rodriguez again suggests that the prison should have moved him to another cell. And again this suggestion is for a personal exemption rather than a policy change. Rodriguez does, however, present another solution that qualifies as an alternative policy.

He relies on the unit's "Standard Operating Procedures," which say that prisoners must never be removed from their cells in anything more than a t-shirt, boxers, and shower shoes. He argues that this policy is good enough for shower transports too. It may be true that in other instances the prison allowed prisoners to be transported while still wearing t-shirts. But the fact that the prison offers inmates the comparative dignity and comfort of wearing a shirt during other activities does not render it illogical or unreasonable to allow less clothing on the way to the shower. *See Thornburgh*, 490 U.S. at 419. Because Rodriguez's proposal would introduce the exact risk of harm the prison is working to prevent, it is not an obvious, easy alternative to the existing policy.

The prison officials therefore did not violate Rodriguez's First Amendment right to freely exercise his religion. Even if these

particular policies substantially burdened Rodriguez's religious exercise, they were rationally related to the prison's legitimate interests in maintaining safe and secure conditions while providing prisoners with the opportunity to shower.

## III.

The prison officials also argue that, regardless of our answer to the First Amendment question, they are entitled to qualified immunity. They say that it was not clearly established that the shower policies infringed the First Amendment.

Under the doctrine of qualified immunity, public officials may not be held liable for damages under § 1983 unless it is shown that they violated "a constitutional right that was clearly established at the time of the challenged action." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (quotation omitted). Qualified immunity covers officials when they are acting within the scope of their discretionary authority; Rodriguez does not dispute that was the case here. *See id.* Qualified immunity therefore applies unless he produces evidence showing (1) that the officials violated a statutory or constitutional right, and (2) "that the right was clearly established at the time of the challenged conduct." *Wade v. United States*, 13 F.4th 1217, 1225 (11th Cir. 2021) (quotations omitted).

Rodriguez concedes that no materially similar case clearly establishes that these kinds of policies violate prisoners' First Amendment rights. Nevertheless, he argues, *Turner* was so decisive that it formed a "broader, clearly established principle that

should control the novel facts of the situation." *Id.* at 1226 (quotation omitted). But that is true only if the case drew a "bright line" between "lawful and unlawful" policies. *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993), *modified on other grounds*, 14 F.3d 583 (11th Cir. 1994). *Turner* drew no such line. Nor did it ask courts to fine tune a prison's policy to accommodate a prisoner's individual request. *See Turner*, 482 U.S. at 90–91. Rodriguez thus has not shown that a reasonable official would have had "fair and clear warning" that his particular conduct was "unlawful and unconstitutional." *Al-Amin v. Smith*, 511 F.3d 1317, 1335–36 (11th Cir. 2008). Even if the prison's policies were improper, the prison officials would be entitled to qualified immunity.

## IV.

Turning to the district court's denials of a discovery motion and appointment-of-counsel motions, we review them for abuse of discretion. *Smith v. Sch. Bd. of Orange Cnty.*, 487 F.3d 1361, 1365 (11th Cir. 2007). Under this standard, a district court "has a range of choice" when managing the discovery process and "its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 811 (11th Cir. 2017) (quotation omitted).

Rodriguez asked the magistrate judge to order prison officials to help him depose other prisoners as he developed his claim that contaminated vegan meals violated the Eighth Amendment. Rejection of that motion did not preclude Rodriguez

from collecting evidence; he acquired affidavits from four other inmates to support his Eighth Amendment claim. And as the magistrate judge explained, Rodriguez failed to show a good-faith attempt to resolve the discovery dispute with the prison officials. *See* Fed. R. Civ. P. 37(a)(1). Part of the problem, the magistrate judge concluded, was that seeking depositions was a "particularly burdensome" method of gathering information and disproportionate to the needs of the case. We see no abuse of discretion.

Nor was the district court obliged to appoint counsel to help with discovery. Appointment of counsel in civil cases is a privilege "justified only by exceptional circumstances," not a constitutional right. *Wahl v. McIver*, 773 F.2d 1169, 1174 (11th Cir. 1985). A district court has "broad discretion" when ruling on such a motion. *Bass v. Perrin*, 170 F.3d 1312, 1320 (11th Cir. 1999). Here, the magistrate judge determined that Rodriguez set forth the essential facts underlying his claims and that the applicable legal doctrines were readily apparent. *See id.* Although we appointed counsel to represent Rodriguez on appeal, it was not an abuse of its discretion for the district court to conclude that no exceptional circumstances justified the appointment of counsel below. *See Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1280 (11th Cir. 2010).

⋆    ⋆    ⋆

Prisons are tasked with providing safety and security for the inmate population as well as for prison staff—but cannot do so by disregarding prisoners' constitutional rights. Here, Rodriguez had

20-11218                 Opinion of the Court                 19

a First Amendment right to free exercise even while he was incarcerated in the Special Management Unit. Though that right was sometimes curtailed because of the prison's legitimate penological requirements, the prison's policies hit the right mark under *Turner*. Rodriguez's constitutional challenge fails.

**AFFIRMED.**

20-11218          JILL PRYOR, J., Concurring          1

JILL PRYOR, Circuit Judge, Concurring in part, concurring in the judgment:

I join Parts III and IV of the majority opinion and concur in its judgment affirming the district court. Because I agree with Part III of the majority opinion that the First Amendment right the defendants stand accused of violating was not clearly established, I would not decide whether Mr. Rodriguez's First Amendment right to free exercise of his religion was violated. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).