[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11722
_____

D.C. Docket No. 2:14-cv-00422-SPC-MRM


JAMAAL ALI BILAL,
f.k.a. John L. Burton,
a.k.a. Superman,

Plaintiff - Appellant,

versus

GEO CARE, LLC,
FNU GARZA,
FCCC Custody Officer, individually and in his official capacity as Transport
Officer,
FNU JARVIS,
FCCC Custody Officer, individually and in his official capacity as Transport
Official,
THE GEO GROUP, INC.,
CORRECT CARE SOLUTIONS, LLC, et al.,

Defendants – Appellees,

DAVID Wilkins,
Secretary, Department of Children & Families,

Defendant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(November 23, 2020)

Before MARTIN, ROSENBAUM, and TALLMAN,[*] Circuit Judges.[1]

ROSENBAUM, Circuit Judge:

The civilly committed may not be punished merely because they are civilly committed. And under the Fourteenth Amendment, they enjoy a substantive-due-process right to liberty interests in, among other things, safety and freedom from bodily restraint. So though the State may appropriately take measures to protect the public from civilly committed individuals found to be dangerous, it must do so in a way that is consistent with professional judgment about what is necessary.

Plaintiff-Appellant Jamaal Ali Bilal is civilly committed and housed in the Florida Civil Commitment Center ("FCCC"), in part because he has been found to represent a danger to the public. Bilal alleged that, during a trip to a court hearing located about 600 miles from the FCCC, Defendants-Appellees, who include the Secretary of Florida's Department of Children and Families ("DCF") and several individuals associated with the FCCC (which is under the purview of the Secretary

_____

[*] The Honorable Richard C. Tallman, Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

[1] We withdraw our opinion issued on November 9, 2020, and replace it with this one. The only difference between the two versions is the addition of what is now footnote 8.

of DCF) and with GEO Care, Inc. (which, by contract, runs the FCCC), restrained, transported, and temporarily housed him in a manner that was inconsistent with professional judgment and therefore violated his Fourteenth Amendment rights. The district court disagreed and dismissed the case for failure to state a claim. After careful consideration and with the benefit of oral argument, we now affirm in part and reverse in part.

**I.**

A.    Background Facts

Bilal is civilly committed at the FCCC under Florida's Involuntary Civil Commitment of Sexually Violent Predators Act, Fla. Stat. § 394.910, *et seq.*, commonly known as the Jimmy Ryce Act. He was sent to the FCCC in 2001 after he stipulated that he qualified as a "sexually violent predator," meaning he was previously convicted of a sexually violent offense, and at the time of commitment, he had a "mental abnormality or personality disorder" that makes him "likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment." Fla. Stat. § 394.912(10). Under Florida law, anyone determined to be a "sexually violent predator" is committed to the custody of the DCF and housed in a secure facility until the individual's condition has improved to the point that it is safe to release him into the community. Fla. Stat. § 394.917(2); *see also Pesci v. Budz*, 730 F.3d 1291, 1299 (11th Cir. 2013). Those committed

3

under the statute are entitled to periodic judicial review to make that determination. Fla. Stat. § 394.918(1).

A state-court judge in Escambia County ordered a hearing at the Escambia County Courthouse in Pensacola, Florida, to determine whether Bilal was eligible for release from civil confinement. Garza and Jarvis,[2] two armed guards from the FCCC, transported Bilal roughly 600 miles by van to Escambia County. The state court then conducted the relevant hearing on September 10, 2013. Following the hearing, Bilal was housed in the Santa Rosa County Jail until October 10, 2013, when the judge denied Bilal's release from civil confinement. At that time, Garza and Jarvis drove Bilal the approximately 600 miles back to the FCCC.

B.    Procedural History

Bilal filed a pro se complaint in state court, invoking 42 U.S.C. § 1983 and Florida Statute § 768.28, and asserting that Defendants-Appellees GEO Care, Inc., ("GEO"), David Wilkins, Garza, and Jarvis (collectively referred to as the "Defendants"), violated his civil rights, based on things that he alleges happened during the trip to and from Escambia County. At the time of the events alleged in the complaint, Wilkins served as the Secretary of Florida's DCF; by contract with

---

[2] The complaint indicates only the last names of the transport guards, so we refer to them by their last names, Garza and Jarvis.

4

DCF, GEO operated and managed the FCCC; and as we have noted, FCCC guards Garza and Jarvis transported Bilal.

Defendants removed the action to the United States District Court for the Middle District of Florida, which ultimately dismissed it. But along the way, Bilal filed a Third Amended Complaint, which added new defendants and is the operative pleading in this case. Among other things, the Third Amended Complaint began referring to GEO as GEO Care, LLC. GEO nonetheless continued throughout the litigation to respond.[3] Because GEO has responded throughout this litigation to filings addressed to GEO Care, Inc., and GEO Care, LLC, we use "GEO" in this opinion to refer to both designations. The Third Amended Complaint also ceased to mention Wilkins, substituting then-DCF Secretary Mike Carroll in his place. *See* Fed. R. Civ. P. 25(d).

We review the relevant allegations in the Third Amended Complaint. But before doing so, we note that we are reviewing the district court's order granting the defendants' motion to dismiss for failure to state a claim under Federal Rule of Civil

---

[3] The alternate name appears to be a misnomer rather than the identification of an incorrect party. Based on the parties' actions—particularly GEO's responsiveness to filings addressing GEO Care, Inc., on the one hand, and GEO Care, LLC, on the other—no uncertainty exists about the identity of the defendant and we can discern no prejudice to GEO. *See Morrel v. Nationwide Mut. Fire Ins. Co.*, 188 F.3d 218, 224 (4th Cir. 1999) (misnomer was immaterial since the defendant was not misled in any way by it). Nor has GEO asserted any defense or filed any motion raising this issue, so any objection appears to have been waived. And under these circumstances, where Bilal seems to have made a mistake as to the name, GEO "should not be permitted to take advantage of a mere misnomer that injured no one." *Grandey v. Pac. Indem. Co.*, 217 F.2d 27, 29 (5th Cir. 1954).

Procedure 12(b)(6). So we set forth the allegations in the complaint as though they are true, viewing them in the light most favorable to Bilal. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1288 (11th Cir. 2010). Of course, if Bilal's action proceeds, he will have to prove his allegations.

Now, the allegations: during the trip to and from Escambia County, Garza and Jarvis used leg irons, waist chains, and black-box[4] restraints on Bilal. They also deprived Bilal of food, except for a bottle of water and two slices of cheese on two stale pieces of bread, and they refused to allow him any bathroom breaks during the lengthy trip. Because Bilal needed to defecate, he had to do so into his clothing and then sit in his feces for about 300 miles of the trip. Plus, the van seats were cramped, and that, in combination with the shackling, aggravated his pre-existing knee injuries. Adding to Bilal's misery, the guards traveled at excessive speeds as Garza "leisurely review[ed] child porn on his cellphone."

Based on these allegations, Bilal set forth several counts in his pro se complaint. Because of Bilal's pro se status, the breakdown of the specific counts is not neat and tidy. But we construe Bilal's complaint to have made the following claims.

---

[4] A black box is a rectangular device that fits over a pair of handcuffs. It is designed to limit hand movements and prevent access to the handcuff's key holes.

6

As relevant on appeal, in Counts I, IV, and VI[5], Bilal alleged that Garza, Jarvis, GEO, and the Secretary of DCF violated his Fourteenth Amendment due-process rights on the 1,200-mile roundtrip journey between the FCCC and the Escambia County courthouse. He complained that transporting him in a van (as opposed to an airplane) for more than 1,200 miles roundtrip, while he was in leg irons, waist chains, and a black-boxed set of handcuffs; feeding him only a single cheese sandwich, which he asserts gave him botulism; putting him in a cramped van in shackles while he had injuries to his knees, which then required him to need to undergo surgeries; forcing him to endure no bathroom stops during the entire journey, which caused him to defecate on himself midway through the trip to Escambia County "and caused suppression and wounded his bowel movements that caused constipation"; and traveling at speeds in excess of 90 miles per hour constituted unjustified punishment and imposed unnecessary and unconstitutional restraints, in violation of the Fourteenth Amendment.

In Count II, asserted against all Defendants, Bilal challenged his stay in the Santa Rosa County Jail while the court was deciding whether to release him. Bilal alleged the stay, like the journey to and from Escambia County, violated the Fourteenth Amendment. He complained that while at the jail, he missed out on

---

[5] The Third Amended Complaint contains two counts numbered "VI." We refer to the first one.

mental-health treatment, which caused him not to be able to advance in his mental-health treatment back at the FCCC; Garza and Jarvis, annoyed with Bilal's complaints, influenced the jail guards to act abusively towards Bilal, which caused Bilal to become suicidal and to have to spend two weeks in a suicide cell in the jail; and he was placed in confinement at the jail and did not have access to television, phone calls, the law library, visitation, fresh-air exercise, canteen privileges, or religious groups.[6]

Bilal sought declaratory and injunctive relief and compensatory and punitive damages.

After Bilal filed the Third Amended Complaint, the district court issued an order directing Bilal, by July 1, 2015, to complete service-of-process forms for the ten additional defendants (including Carroll and GEO Care, LLC) and to return ten additional copies of the Third Amended Complaint to the court for service. The Order warned that "[f]ailure to return the completed forms within this allotted time period without further explanation **will result in dismissal** of this action without further notice."

---

[6] Bilal also made some other claims that are not at issue on appeal, since he did not brief them. We therefore do not address them. *See Access Now, Inc. v. Sw. Airlines Co.,* 385 F.3d 1324, 1330 (11th Cir. 2004) ("[A] legal claim or argument that has not been briefed before the [appellate] court is deemed abandoned and its merits will not be addressed.")).

Bilal sought a thirty-day extension of time to file a notice of lawsuit and request for waiver of service of summons, summons, and United States Marshal Service Form 285.  Upon considering Bilal's motion, the district court noted that the original Defendants (who had previously received service of process) had not yet filed a response to the Third Amended Complaint.  So it directed those Defendants (GEO, Wilkins, Garza, and Jarvis) to file a response to the Third Amended Complaint.  The court also found good cause to grant Bilal's motion for extension of time, and it gave him an additional thirty days from June 18, 2015, to comply with the previous order.  It warned that "[f]ailure to do so may result in the dismissal of the unserved defendants without further notice."

In accordance with the district court's order, the original Defendants filed a Motion to Dismiss the Third Amended Complaint on August 7, 2015.  Among other things, Defendants argued that, for the most part, the complaint failed to state a claim.  Nevertheless, Defendants conceded that Garza and Jarvis's alleged failure to allow a bathroom break "may be enough to state a claim" but asserted that it was not clear what type of claim Bilal intended to pursue.  At the conclusion of their Motion to Dismiss, Defendants sought dismissal of all claims "except for claims against Defendant GARZA and JARVIS in the first Count VI relating to [their] alleged[] refus[al] to allow [Bilal] a bathroom break during his trip to his hearing."

9

Bilal opposed Defendants' motion, but after Bilal's extended period to serve the remaining Defendants expired, the district court granted the motion. Noting that more than 120 days had passed since Bilal had filed the Third Amended Complaint, the district court also concluded that seven of the ten ostensibly as-yet unserved Defendants, which it said included GEO, should be dismissed under Federal Rule of Civil Procedure 4(m), and closed the case. As for the three other supposedly unserved Defendants (Craig Beloff, Manuel Fernandez, and Secretary Carroll), the district court acknowledged that Bilal had submitted service forms for them. But because the district court determined that the complaint failed to state any constitutional claims, it did not direct service on these individuals. Based on its dismissal order, the district court entered judgment in favor of Defendants and against Bilal.

Soon after, Bilal filed an affidavit regarding service. In the affidavit, Bilal explained that he put approximately sixteen U.S. Marshal forms in the mailbox, addressed to FCCC's general counsel Brian Masonry, within the 120-day deadline for service. He claimed he was indigent and could not afford the cost of serving the sixteen defendants in this case. On the same date, Bilal filed a motion to vacate the judgment and a motion to vacate the opinion granting the motion to dismiss. He later filed an amended motion to vacate and then a motion to reopen the case.

10

Noting Bilal's pro se status, the district court liberally construed the filings as motions for reconsideration under Rule 60, Fed. R. Civ. P.  Ultimately though, the district court found no reason to grant relief.  And as to service, the district court noted that Bilal had failed to comply with the court's orders.

Bilal appealed.  We appointed counsel to represent him in these appellate proceedings.[7]

## II.

Bilal challenges the district court's dismissal of his Fourteenth Amendment claims relating to his transport and to his detention.  He also objects to the district court's sua sponte dismissal of the case for lack of service of process.  We address Bilal's Fourteenth Amendment claims in Section A and his service-related claim in Section B.

## A.

We review de novo the district court's dismissal of a case for failure to state a claim.  *Speaker v. U.S. Dep't of Health & Hum. Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010); *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003) (per curiam).  As we have mentioned, on a Rule 12(b)(6) motion, we "accept the factual allegations in the complaint as true and construe them

---

[7] We thank Attorney Valarie Linnen for accepting the appointment and capably discharging her duties.

in the light most favorable to the plaintiff." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir.), *cert. denied*, 139 S. Ct. 2678 (2019). In determining whether a complaint survives a Rule 12(b)(6) challenge, we ask whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In conducting our review, we liberally construe pro se pleadings and hold them to "less stringent standards" than we apply to formal pleadings that lawyers draft. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *see also Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam). Nevertheless, we cannot act as de facto counsel or rewrite an otherwise deficient pleading to sustain an action. *GJR Invs., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998), *overruled on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

## 1.

The Due Process Clause of the Fourteenth Amendment promises that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This Clause applies to civilly committed detainees

12

like Bilal, who bring § 1983 actions. *Dolihite v. Maughon*, 74 F.3d 1027, 1041 (11th Cir. 1996) (citing *Youngberg v. Romeo*, 457 U.S. 307 (1982)). Under the Fourteenth Amendment, those who are civilly committed enjoy a substantive-due-process right to liberty interests in, among other things, safety and freedom from bodily restraint. *Id.*

Nevertheless, a civilly committed individual's right to freedom from bodily restraint is not absolute. *See Romeo*, 457 U.S. at 319–20. We apply a balancing test to determine whether a State's restraints on a civilly committed person violate that individual's substantive-due-process rights. In particular, we balance the person's liberty interests against the reasons the State sets forth for restricting the individual's liberty. *Id.* at 320–21. When we do so, we keep in mind that those who have been involuntarily civilly committed are due a higher standard of care than those who have been criminally committed, since the conditions of confinement for the criminally committed are "designed to punish," but those of the civilly committed are not. *Dolihite*, 74 F.3d at 1041 (quoting *Romeo*, 457 U.S. at 322) (quotation marks omitted).

Once the State articulates a legitimate reason for restraining the civil committee's liberty, "the Constitution only requires that the courts make certain that professional judgment in fact was exercised" in the times and way the institution restrains the person's liberty. *Romeo*, 457 U.S. at 321 (internal quotation marks

13

omitted).   In this respect, decisions made by professionals employed by civil-commitment centers are presumptively valid; liability attaches only when the decision represents "such a substantial departure from accepted professional judgment, practice, or standards" that it shows that the employee did not, in fact, make the decision based on sound professional judgment.[8] *Id.* at 323.

Here, Florida's interest in restraining Bilal is a security one:  "protecting the public" from those determined to be sexually violent predators.  *Pesci*, 730 F.3d at 1299 (quoting *Westerheide v. State*, 831 So. 2d 93, 112 (Fla. 2002)) (internal quotation marks omitted).  That is certainly a legitimate interest.  *See id.*  So below, we consider each of the practices Bilal experienced in the name of this interest during his roundtrip to Escambia County and his stay in the Santa Rosa County Jail and evaluate whether any of them is inconsistent with professional judgment.

## 2.

### a.  The Transport Claims

---

[8] For purposes of our discussion, we assume without deciding that all Defendants are subject to the professional-judgment standard, since no one has argued otherwise, and we are reviewing an order on a motion to dismiss.  For that reason, we do not have any information about various individuals' training or complete responsibilities, as discovery has not yet occurred.  *See Youngberg v. Romeo*, 457 U.S. 307, 323 n.30 (1982) ("By 'professional' decisionmaker, we mean a person competent, whether by education, training or experience, to make the particular decision at issue," such as "persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the [mentally unwell].").

First, we address Bilal's claims concerning his van transport to and from Escambia County.  We begin with his complaints about the use of leg irons, waist chains, and black-box restraints during the van transport, the cramped van quarters, the stale sandwich, and the excessive driving speeds during the van transport.  None of these things, alone or in combination, states a Fourteenth Amendment violation in this case.  But we conclude that Bilal's challenge that Defendants permitted no bathroom stops during the journey and forced him to sit in his own excrement for roughly 300 miles does state a claim under the Fourteenth Amendment.  We explain each resolution below.

i.    *Bilal's allegations about the shackles, transport by van instead of airplane, the stale sandwich, and the driving speeds fail to state a Fourteenth Amendment claim*

As we have noted, Florida restrained Bilal during transport to protect the public.[9]  The State's psychologist, Dr. Gregory Prichard, Ph.D., has described Bilal as a "borderline psychopath" and "one of the most dangerous individuals" in the FCCC.  Against this assessment of Bilal's threat to the public, we cannot say that Defendants' decision to use leg irons, waist chains, and black-box restraints during the journey to ensure that Bilal did not escape was inconsistent with professional judgment.  *See Beaulieu v. Ludeman*, 690 F.3d 1017, 1032–33 (8th Cir. 2012)

---

[9] Bilal does not contend he was restrained while housed in the FCCC, where he would not have access to the public.  So that is not at issue.

15

(finding policy of placing civilly committed sexually violent individuals in full restraints during transportation to and from facility was justified by safety concerns and did not violate patients' substantive-due-process rights).

Bilal's complaints about the cramped seating in the van and the alleged effect on his knees of the seating and the restraints do not affect the decision. Bilal asserts that he would have preferred to fly rather than drive to Escambia County. But Bilal does not allege that a different way of restraining him during the travel would have been substantially better for his knees or that Defendants' use of the chosen restraints somehow fell outside the realm of professional choices. He also has not explained why driving represents a significant departure from professional judgment in selecting a method to deliver him securely to and from Escambia County. And that is especially so since Bilal's proposed alternative—flying—can itself require cramped seating.

To the extent that Bilal complains that the State commits a Fourteenth Amendment violation merely by requiring road travel instead of authorizing air travel, he also fails to state a claim. While we have recognized a Fourteenth Amendment claim arising from the placement and confinement of a detainee in an unventilated and un-air-conditioned transport van for an extended period, *see Patel v. Lanier Cnty.*, 969 F.3d 1173 (11th Cir. 2020), Bilal did not allege that to be the case here. Millions of people in this country make lengthy road trips every day for

16

business, vacation, and personal reasons.  And they do so by car, van, bus, and truck.  There is nothing inherently punishing about a State's decision to transport its prisoners by van rather than plane.

Though we are troubled by Bilal's claim that Garza and Jarvis drove at speeds up to 90 miles per hour, taking Bilal's complaint as a whole, we cannot say that this allegation states a Fourteenth Amendment violation.  Other than any inherent threat to safety that traveling at speeds up to 90 miles per hour may represent, Bilal did not assert that Defendants' driving was itself reckless.  And Bilal was delivered safely to Escambia County and back again to the FCCC.

As for the stale sandwich and single bottle of water provided during the trip, we likewise do not conclude that those choices were so extreme and unreasonable as to amount to a violation of Bilal's constitutional rights.  The Fourteenth Amendment requires only that the State provide Bilal with "reasonably adequate food." *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (food that should be served hot and is sometimes served cold, "while unpleasant, does not amount to a constitutional deprivation").  And although Bilal asserts in his complaint that he should have been fed a hot meal during transport, many people have cold lunches every day.  Bilal also did not suggest that he was denied breakfast or dinner at his departure and destination locations, in addition to the cheese sandwich en

route.   Nor did he allege he was dangerously and inappropriately deprived of sufficient nutrition over the course of his travel days.

Even assuming the sandwich caused him food poisoning,[10] Bilal does not contend that Defendants knew or should have known that the sandwich would make him sick.  *Cf. Roberts v. Williams*, 456 F.2d 819, 827 (5th Cir. 1972)[11] ("We might say careless preparation of a single meal, producing food poisoning in prisoners, was not cruel, but it might be so if the jailors negligently allowed the jail's only drinking water supply to become permanently infected with typhoid bacteria.").  Under these circumstances, feeding Bilal only a cheese sandwich and a bottle of water during the road trip did not violate his Fourteenth Amendment rights.

> ii.    *Bilal's allegations that Defendants would not allow him to use the bathroom and required him to sit in his own excrement for 300 miles state a Fourteenth Amendment claim*

---

[10] We construe Bilal's allegation that the cheese sandwich caused him botulism to mean that the cheese sandwich resulted in some type of food poisoning.  Botulism, which attacks nerves, causes difficulty breathing, muscle paralysis, and death in the absence of immediate, proper medical treatment.  https://www.cdc.gov/botulism/general.html (last visited Nov. 9, 2020).  It is treated with an antitoxin that does not correct the damage the Botulinum toxin inflicts but rather prevents the toxin from further harming the victim's nerves.  https://www.cdc.gov/botulism/testing-treatment.html (last visited Nov. 9, 2020).  As a result, even when death can be prevented, botulism victims can require months of hospitalization while they recover from the nerve damage.  *See id.*  Although we do not make credibility determinations in reviewing a motion to dismiss, we note the absence in Bilal's complaint of any allegations at all concerning the devastating effects that would result from botulism.  Considering Bilal's pro se status, we therefore liberally construe his complaint to allege that the cheese sandwich caused him, more generally, some kind of food poisoning.  In any case, whether Bilal suffered botulism or some other type of food poisoning does not bear on the analysis.

[11] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), we accepted as binding precedent all published Fifth Circuit opinions issued before October 1, 1981.

18

But Bilal's allegations that Garza and Jarvis refused to allow him to use the bathroom during a 600-mile road trip, which caused Bilal to have to defecate in his clothing and sit in his excrement for about 300 miles, do state a claim under the Fourteenth Amendment.

Our decision in *Brooks v. Warden*, 800 F.3d 1295 (11th Cir. 2015), requires this result. Brooks, a prison inmate, alleged that he was forced to defecate in his prison jumpsuit and sit in his own feces for two days during his three-day hospital stay because the guard did not want to temporarily lower Brooks's waist chains to allow him to use the toilet. *Id.* at 1299, 1303. Brooks also asserted the guard would not allow the nurses to clean him or offer him an adult diaper. *Id.* at 1303. We determined that these "serious allegations" stated an Eighth Amendment conditions-of-confinement claim. *Id.* We recognized that the Constitution protects prisoners from being exposed to objectively "unreasonable risk[s] of serious damage to [their] future health" and that the conditions of confinement must meet "the evolving standards of decency that mark the progress of a maturing society." *Id.* (citations and internal quotation marks omitted).

As we explained, "conditions that deprive inmates of the minimal civilized measure of life's necessities are violative of the contemporary standard of decency that the Eighth Amendment demands"—in particular, the right "not to be confined . . . in conditions lacking basic sanitation." *Id.* at 1303–04 (citation and

19

internal quotation marks omitted).  We also recognized that a common thread ran through prison-condition cases—the deprivation of "basic elements of hygiene." *Id.* at 1304 (quotation omitted).  Upon surveying our sister Circuits' rulings in this area, we noted that each had recognized that the "deprivation of basic sanitary conditions" can state a constitutional violation.  *Id.* (collecting cases, including those dealing with exposure to human waste).

We concluded that Brooks's allegations were, in some ways, worse than those in the cases we had reviewed, since he was forced to lie in "direct and extended contact with his own feces" without the ability to clean himself.  *Id.* at 1305. (comparing *Hope v. Pelzer*, 536 U.S. 730, 735 (2002)).  Although the *Brooks* defendant claimed that Brooks had not alleged any harm except mere discomfort, we concluded that "he sufficiently alleged a substantial risk of serious harm" because "the health risks of prolonged exposure to human excrement are obvious." *Id.* Finally, we determined that Brooks sufficiently averred that the guard was deliberately indifferent to Brooks's needs because Brooks had repeatedly asked to remove his jumpsuit and use the toilet.  *Id.*

*Brooks* stands for the proposition that an unreasonable refusal to allow a prisoner to use the restroom, which results in his being forced to sit in his own feces for an extended period, constitutes an Eighth Amendment violation.  True, Bilal is not a criminal prisoner; he is a civilly committed individual.  But Fourteenth

Amendment substantive-due-process rights are at least equivalent to the comparable Eighth Amendment rights of those incarcerated. *Dolihite*, 74 F.3d at 1041. So "relevant case law in the Eighth Amendment context also serves to set forth the contours of the due process rights of the civilly committed." *Id.* And we have specifically recognized that actions that would violate a prisoner's Eighth Amendment conditions-of-confinement rights would also violate the due-process rights of the involuntarily civilly committed, since conditions that transgress the Eighth Amendment standard undoubtedly violate the higher standard owed to civil committees under the Fourteenth Amendment. *See id.*

Here, Bilal adequately alleged that Jarvis and Garza did not allow him bathroom breaks and "refused" to stop at any restroom. Because of the guards' "refus[al]," Bilal was forced to relieve himself in his clothing. And since Bilal contended that this happened midway through the 600-mile one-way trip, during which he was waist-chained with black-boxed handcuffs, we must infer that Bilal was forced to sit in his own feces for a roughly 300-mile drive.

To be sure, the length of time is not as prolonged and drastic as the two days in *Brooks*, but it states a claim, nonetheless. Indeed, in *Brooks* we commented on the extreme nature of the allegations as compared to other situations courts encountered. *See Brooks*, 800 F.3d at 1305 (noting that in *Hope*, 536 U.S. at 735, seven hours was sufficient to state a claim). And here, as we've noted, Bilal is a

21

civilly committed person, not a criminal prisoner. Civilly committed individuals are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Romeo*, 457 U.S. at 322.

It seems doubtful that a legitimate reason exists to refuse a civilly committed prisoner an opportunity to relieve himself during a 600-mile road trip. But if one does, Defendants will have an opportunity to present it as the case proceeds. In any case, barring exigent circumstances, restroom breaks should come more frequently than every 600 miles on a road trip.

In short, we conclude that refusing a single bathroom stop during a 600-mile road trip and requiring a civilly committed person to sit in fecal matter for several hours fits squarely within the definition of "deprivation of basic sanitary conditions." For that reason, those actions are not consistent with a civilly committed person's interest in reasonably safe conditions, and they violate the Fourteenth Amendment. So Bilal's claim in this regard should not have been dismissed, and we reverse that dismissal.

### b.    The Jail-Housing Claim

Bilal argues that the district court also erred in dismissing his claim concerning his month-long stay in the Santa Rosa County Jail in connection with his one-day hearing. We agree.

22

As we have noted, those who are civilly committed may not be punished at all merely because of their status as civil committees. *See Romeo*, 457 U.S. at 316. Bilal asserts that his housing at the jail amounted to punishment.

As with the restraints Defendants employed when they transported Bilal, the State's interests in determining housing for Bilal include security and the safety of the public. We have recognized these as valid interests. *See Lynch v. Baxley*, 744 F.2d 1452, 1458 (11th Cir. 1984). Moreover, the State's interest in security and the safety of the public is particularly strong in this case because among an already dangerous group—those determined to be sexually violent predators "likely to engage in acts of violence if not confined in a secure facility"—Bilal has been diagnosed as "one of the most dangerous." Fla. Stat. § 394.912(10).

The district court concluded that Bilal lacked a liberty interest in not being housed temporarily in a jail. To reach this conclusion, it relied on *Meachum v. Fano*, 427 U.S. 215 (1976). That was error because *Meachum* involved a criminal prisoner, not a civil committee. *See id.* at 216. And as we have explained, duly convicted criminal prisoners do not share the same liberty interests as those who have been civilly committed. In *Meachum*, the Supreme Court concluded that a criminal conviction "sufficiently extinguishe[s] [a prisoner's] liberty interest [so as] to empower the State to confine him in *any* of its prisons." *Id.* at 224.

But in *Lynch*, we acknowledged that those awaiting involuntary civil-commitment proceedings have a liberty interest in not being housed unnecessarily in jails. *Lynch*, 744 F.2d at 1458. So while the State has a compelling and legitimate interest in public safety, it cannot satisfy that interest "by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id.* at 1459 (quoting *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)) (internal quotation marks omitted). In particular, we explained, even if the mentally ill represent a danger to themselves or others, they may not be housed in jails if less restrictive, secure options, such as a mental hospital or other health facility, are available. *Id.* at 1461, 1463.

In reaching this conclusion, we noted that temporary confinement in a jail is "particularly harmful to those who are mentally ill." *Id.* at 1458. And we emphasized that jail is typically not the "least restrictive means" for protecting society from the mentally ill who are dangerous. *Id.*

*Lynch* dealt with the mentally ill who were being held before they were civilly committed. But it applies with equal force to those who have already been civilly committed. We explained in *Lynch* that "emergency detainees cannot be subjected to conditions of confinement substantially worse than they would face upon commitment." *Id.* at 1461. In other words, we acknowledged the baseline for conditions of confining the mentally ill—either pre- or post-commitment—as those

24

conditions that are not "substantially worse than they would face upon commitment." *Id.* And we have already noted that conditions of confinement for the mentally ill may not inflict punishment simply because a person has been civilly committed. *See Romeo*, 457 U.S. at 316. In contrast, jails may be designed to appropriately punish the convicted individuals they hold. So the mentally ill may not be housed there, even for security reasons, unless no less restrictive, secure option is available.

We reject Defendants' suggestion that those who have been civilly committed under Florida's Jimmy Ryce Act somehow do not enjoy the same protections from punishment as those who have otherwise been civilly committed. As we explained in *Pesci*, although the civilly committed under the Jimmy Ryce Act have previously been convicted of crimes, they have served their time; they are not prisoners, and the FCCC is not a prison. 730 F.3d at 1292, 1297. So the State may not justify a restraint on a civil committee's constitutional rights "for reasons related to punitive conditions of confinement." *Id.* at 1298.

Here, Bilal alleged that when he was housed in the Santa Rosa County Jail, he was subjected to punishing conditions. He asserted that, among other things, he "was placed into the jail's confinement unit" and "did not have access to[] TV, phone calls, law library, visitation, fresh air exercise, canteen privileges, or access to religious and/or group." He also contended that he did not receive any mental-health

25

treatment, and the jail guards were abusive and engaged in "show of force tactics that caused . . . Bilal to become suicidal and spend more than two weeks in a suicide cell at the jail."

Under *Lynch*, the State bore the burden of achieving public security in housing Bilal by the least restrictive means—meaning it could not house Bilal at the jail unless no mental-health facility was both secure and within a reasonable distance of the Escambia County courthouse. Because Bilal was housed in a jail instead, he has sufficiently stated a Fourteenth Amendment claim for purposes of surviving a motion to dismiss. During further proceedings, if the State can demonstrate that housing Bilal for a month at the Santa Rosa County Jail represented the "least restrictive means" for ensuring the safety and security of the public, *see Lynch*, 744 F.2d at 1459, it would be entitled to a judgment in its favor on Bilal's Fourteenth Amendment claim.[12] But under *Lynch*, the onus remains on the State to so demonstrate.

In sum, we conclude that Bilal has sufficiently alleged a Fourteenth Amendment claim concerning his confinement in the Santa Rosa County Jail for one

---

[12] Defendants assert that they are not proper defendants for Bilal's jail-housing claim. They raise this argument for the first time on appeal. Their argument also relies entirely on documents that Defendants did not file in the district court or otherwise bring to the court's attention, even though the documents were available to Defendants before the district court ruled on Defendants' motion to dismiss. We have "repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (citation and quotation marks omitted). We follow that policy here.

month to attend a one-day hearing.  For that reason, we reverse the dismissal of Count II of the Third Amended Complaint and remand for further proceedings consistent with this opinion.

## B.

Finally, Bilal argues that the district court erred in dismissing ten parties sua sponte because they had not been served with process.  We review for abuse of discretion the district court's dismissal for lack of service under Rule 4(m), Fed. R. Civ. P., without prejudice.  *Lepone-Dempsey v. Carroll Cnty. Comm'rs*, 476 F.3d 1277, 1280 (11th Cir. 2007).

We begin with the district court's dismissal of GEO and the DCF Secretary for lack of process.  In fact, the record reflects that GEO was served with process, as it acknowledged in its Notice of Removal to federal court.  And attached to that Notice were return-of-service forms for both GEO and then-DCF Secretary Wilkins.  One of the district court's orders also acknowledged that the original Defendants (GEO, Wilkins, Garza, and Jarvis) had "previously received service of process" and directed them to file a response to the Third Amended Complaint.  Defendants complied, filing their Motion to Dismiss.

It appears the district court may have confused GEO with one of the new defendants, "The GEO Group, Inc.," which was not served.  This apparent confusion led to the dismissal of the wrong party—GEO.  And in dismissing DCF Secretary

27

Carroll, the district court may have overlooked the fact that his predecessor, Wilkins, was served and responded to the Third Amended Complaint as the then-DCF Secretary. Under Rule 25(d), Fed. R. Civ. P., when a public officer who is a party in an official capacity ceases holding office while the action is pending, "automatically," the succeeding officer is substituted as a party. *See id.* This is so, regardless of whether the court actually orders the substitution. *Id.*

Defendants do not dispute these facts. Rather, they argue that the district court correctly dismissed the action against GEO and the DCF Secretary only because, in their view, the entire action failed to state any constitutional claims. But as we have already explained, that argument is without merit. So we conclude that the district court erred in sua sponte dismissing GEO and Carroll from the action, to the extent that they are implicated in the bathroom-related claim (the first Count VI) or the jail-housing claim (Count II). Bilal alleged the first Count VI against Garza, Jarvis, and "all other FCCC transport officials." Because we must construe Bilal's pro se pleadings liberally, *Erickson*, 551 U.S. at 94, we understand this to include, besides Garza and Jarvis, any FCCC official or contractor (GEO) responsible directly or indirectly for transport, including the DCF Secretary, who is charged with the administration of the FCCC. *See* Fla. Stat. §§ 394.9151, 394.917(2), 394.930. As for Count II, that refers to "Defendants named above" and more specifically to the DCF Secretary.

Next, we consider the district court's dismissal for lack of service of Beloff, who was the director of security at the FCCC during the events Bilal alleged, and Fernandez, who was the senior vice president of GEO.[13] The record reflects that Bilal submitted the required service forms to the Marshals Service so that these Defendants would be served.

Nevertheless, the district court dismissed these defendants and declined to direct service on them because it concluded that the Third Amended Complaint did not state a claim for a constitutional violation. Since we do not agree with that determination and Beloff and Fernandez could be officials involved in FCCC transport, for purposes of the first Count VI, and are "Defendants named above," as designated in Count II, service should have been completed on them. Bilal was entitled to rely upon the Clerk of the Court and Marshals Service to serve these defendants for which he provided proper service forms. *See Fowler v. Jones*, 899 F.2d 1088, 1095 (11th Cir. 1990).

Finally, we turn to the remaining Defendants the district court dismissed for lack of service. At the time the district court dismissed Defendants it believed were unserved, Rule 4(m) required the district court to dismiss an action without prejudice

---

[13] Bilal also submitted a service form for Carroll. As we have explained, though, no additional service was necessary, since he was automatically substituted for Wilkins when Carroll became the Secretary of DCF. Since that time, Chad Poppell has taken over as Florida's Secretary of DCF. So under Rule 25(d), he is now automatically substituted for Carroll.

against a defendant who had not been served within 120 days after the plaintiff filed the complaint, unless the plaintiff "show[ed] good cause for the failure."[14]  Fed. R. Civ. P. 4(m) (2007).  "Good cause" requires the existence of "some outside factor, such as reliance on faulty advice, rather than inadvertence or negligence."  *Lepone-Dempsey*, 476 F.3d at 1281 (citation, quotation marks, and alteration omitted).

Yet we have noted that even when a plaintiff cannot demonstrate good cause, the district court "must still consider whether any other circumstances warrant an extension of time based on the facts of the case."  *Id.* at 1282.  For example, we have explained that where the statute of limitations would preclude refiling, or where the defendant evades service or hides a problem with attempted service, the Advisory Committee Note to Rule 4(m) suggests that an extension might be appropriate.  *Id.* at 1282 (citing Fed. R. Civ. P. 4(m) advisory committee's note to 1993 amendments). So a district court may exercise its discretion to dismiss the case without prejudice or to direct service to be accomplished within a set time only after it evaluates any factors that may bear on this determination.  *Id.*  And a district court's dismissal of a case under Rule 4(m) after finding that the plaintiff did not demonstrate good cause but before considering whether the facts of the case justify a permissive extension of the service period is "premature."  *Id.*

---

[14] Effective December 1, 2015, the service period changed from 120 days to 90 days. *See* Fed. R. Civ. P. 4(m) (2015).

Here, the district court noted that more than 120 days had passed since Bilal filed his Third Amended Complaint, and it gave Bilal two extensions to serve the unserved Defendants. Bilal still did not do so, and the district court dismissed the unserved Defendants. Nevertheless, the district court did not consider whether Bilal demonstrated good cause for a further extension, since it essentially concluded that its determination that the complaint failed to state a claim mooted the issue. And even if we could read the district court's order as implicitly finding no good cause to further extend the service period, the district court's order does not indicate that the district court evaluated whether any other circumstances of the case justified a further extension. So we must vacate the dismissal of the Third Amended Complaint against these remaining Defendants and remand to allow the district court to consider whether good cause or other circumstances warrant a further extension of the service period.

## III.

For the reasons we have explained, we reverse the district court's dismissal of Bilal's Fourteenth Amendment Due Process claims arising from his bathroom-related allegations and his jail-housing claim, as well as the order dismissing Defendants for lack of service. We affirm the district court's dismissal order in all other respects and remand for further proceedings consistent with this decision.

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

31