[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-10182

Non-Argument Calendar

_____

TONNIE NEALY,

Plaintiff-Appellant,

*versus*

DONALD SAWYER,
EMILY SALEMA,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 2:21-cv-00640-JLB-NPM

_____

Before JORDAN, JILL PRYOR, and BRASHER, Circuit Judges.

PER CURIAM:

Tonnie Nealy, a *pro se* civil detainee held at the Florida Civil Commitment Center, appeals the district court's grant of summary judgment in his civil rights suit seeking damages and injunctive relief under 42 U.S.C. § 1983. He argues that the defendants were deliberately indifferent to a substantial risk of harm and failed to exercise sound professional judgment because they placed a violent resident—whom Nealy refers to as RN—in the same dormitory as him. RN ultimately punched Nealy in the face during an altercation with a security guard, causing serious injuries. But the record lacks evidence that the defendants' decisions were substantially outside the scope of accepted professional judgment. Therefore, we affirm.

## I.

Nealy sued the Center administrator Donald Sawyer and clinical director Emily Salema for failing to protect him from a substantial risk of serious harm in violation of his Fourteenth Amendment rights while he was a civil detainee at the Center. According to his complaint, Nealy was housed in Lakes Dormitory. At the same time, RN was "Baker Acted" and civilly committed as a violent sexual predator and housed in the same dorm. *See* Fla. Stat. § 394.463 (allowing people with mental illness to be involuntarily committed). Nealy alleged that RN had a "long standing, pervasive and well documented history of physically assaulting other

24-10182               Opinion of the Court                3

residents and staff at [the Center]" which was documented in incident reports reviewed by Salema and Sawyer. The Center housed RN in Lakes Dorm despite its policy of housing Baker Acted residents in Rivers Dormitory, apart from the other civil detainees. At all relevant times, Salema was responsible for recommending housing assignments at the Center and Sawyer was responsible for approving or denying those recommendations.

In August 2021, Nealy saw RN grab an officer's radio before wrestling the officer to the floor. While on the floor, RN repeatedly punched the officer in the face before attempting to stab the officer with a sharp metal object. In fear of both his and the officer's lives, Nealy tried to restrain RN. In the process, RN punched Nealy in the eye, causing "severe physical pain" and "mental anguish."

In the aftermath, Nealy sued Salema and Sawyer. He alleged that they were aware that RN posed a substantial risk of serious harm to himself, the staff, and all others in Lakes Dorm and that they were deliberately indifferent to that risk by assigning RN to Lakes Dorm. Nealy sought $5 million in damages and requested injunctive relief to require the Center to house Baker Acted residents apart from the other detainees.

Salema and Sawyer filed a motion for summary judgment and included affidavits from Salema, Sawyer, and Jon Carner—the security director at the time of the incident. According to the affidavits, RN was never Baker Acted. And while Rivers Dorm was the residential mental health unit that housed Baker Acted and other

qualifying individuals, RN never qualified to be a mental-health patient.

Although staff previously requested that the sheriff's department transfer RN to county jail as his charges for an earlier assault were pending, the sheriff's department refused, and the Center housed RN in Lakes Dorm instead. Lakes Dorm features enhanced security with security staff presence and video surveillance twenty-four hours a day. A security team member makes rounds throughout the dorm but is otherwise stationed at a desk with "a clear sight line down the hallway in Lakes Dorm." Upon an emergency, the staff member could trigger an alert and additional staff would arrive on scene within three minutes. And based on the security director's experience with Lakes Dorm, one on-duty security team member was sufficient to ensure safety.

Furthermore, residents in Lakes Dorm must have a staff escort if they leave the dorm for any reason, and residents who are on "wing restriction" status—like Nealy and RN—must stay in their own rooms or the common areas. In addition to "wing restriction" status, residents who commit "serious rules infractions such as fighting" can receive more restrictive "secure management status" for up to seventy-two hours. But because RN had not recently threatened or attempted to assault anyone, he was not viewed as a risk to others warranting "secure management" status. And neither Salema nor Sawyer were aware that RN ever threatened either Nealy or the officer that he attacked prior to the incident.

Nealy filed a response in opposition to the motion for summary judgment supported by affidavits and Center records. These affidavits—from Nealy and another resident who witnessed the incident—insisted that secured management status was not limited to a seventy-two-hour period, that both Nealy and the witness had been placed on this restrictive status for weeks or months at a time, and that staff took about twenty minutes to respond to the incident in question. And the records establish that RN attacked staff or residents on at least six occasions between January 2020 and June 2021 prior to the August 2021 incident. According to Sawyer's and Salema's interrogatory responses, they were aware of these incident reports. Nealy also denied Salema and Sawyer's accounts of the following: RN's security status at the Center; RN's history of threatening or attacking Nealy, the officer, and other residents; the Center staff's efforts to house RN in county jail; the security arrangements in Lakes Dormitory; and the nature of "secure management status," both generally and as applied to RN. But he did so without explanation or additional evidence. Based on this account, Nealy suggests that Salema and Sawyer could have prevented the incident by placing RN on secured management status but chose not to despite the threat he posed to others.

The district court ultimately granted the motion for summary judgment, and Nealy timely appealed.

## II.

We review *de novo* the district court's grant of summary judgment with all evidence and factual inferences viewed in the

light most favorable to the non-moving party. *Burton v. Tampa Hous. Auth.*, 271 F.3d 1274, 1276–77 (11th Cir. 2001). But "[m]ere conclusory allegations and assertions will not suffice" to survive a motion for summary judgment. *Early v. Champion Intern. Corp.*, 907 F.3d 1077, 1081 (11th Cir. 1990).

## III.

The district court properly granted summary judgment. A civil detainee's rights to reasonably safe conditions of confinement are protected by the Fourteenth Amendment. *Dolihite v. Maughon By & Through Videon*, 74 F.3d 1027, 1033 (11th Cir. 1996). In this context, decisions made by professionals at a commitment center are "presumptively valid," and defendants are liable only when the decision "represents such a substantial departure from accepted professional judgment, practice, or standards that it shows that the employee did not, in fact, make the decision based on sound professional judgment." *Bilal v. Geo Care, LLC*, 981 F.3d 903, 912 (11th Cir. 2020) (internal quotation marks and citation omitted).

The evidence establishes that Sawyer and Salema's decisions reflected sound professional judgment consistent with the Fourteenth Amendment. We have previously recognized that the Center has "relevant and legitimate" interests in making sure the facility is "secure and that it serve[s] a rehabilitative purpose." *Pesci v. Budz*, 730 F.3d 1291, 1299 (11th Cir. 2013). Additionally, the Center staff "are the ones that are best equipped to make difficult decisions regarding the administration of the facility" in pursuit of these interests. *Id.* (quotation marks and citation omitted). Therefore,

Sawyer and Salema's decisions to this effect are presumptively valid so long as they do not constitute a "substantial departure from accepted professional judgment, practice, or standards." *Bilal*, 981 F.3d at 912.

Even assuming all of Nealy's assertions are true, nothing in the record establishes that Sawyer and Salema acted outside the bounds of accepted professional judgment. The Center attempted to transport RN to county jail, but the jail refused. So the Center housed RN in an enhanced security facility. At least one guard was present in that facility at all times, and there was twenty-four-hour video surveillance. In case of emergency, the additional guards could typically be on site within three minutes. Based on the security director's experience with Lakes Dorm, he believed that one security officer stationed at the dorm was sufficient to keep it safe at the time of the incident. And even though the Center records reveal that RN physically confronted a security staffer two months prior to the incident, the Center staff did not believe this incident was recent enough to warrant placing RN on secured management status. Nealy generally denies these facts, but he does so without producing any additional evidence or testimony of any specific facts. Nealy's contentions are insufficient to survive summary judgment given the governing standard. *See Youngberg v. Romeo*, 457 U.S. 307, 321 (1982) (agreeing with the standard set out by a concurring judge: "[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.") (internal

quotation marks and citation omitted). We cannot say that the placement of RN in an enhanced security facility without secured management statutes was a "substantial departure from accepted professional judgment, practice, or standards." *Bilal,* 981 F.3d at 912.

## IV.

We **AFFIRM.**